www.janssenbiotech.com v. Janssen Biotech, Inc. 2013-13-38-46 Mr. Lee Thank you, Your Honor. May it please the Court, my name is Bill Lee and together with Arthur Coviello, I represent AbbVie. I would like to address three issues today. First, the District Court's instruction on the burden of proof and the exclusion of evidence that was relevant to that burden. Mr. Lee, I'd like to get the written description. That was one of the three, Your Honor. I figured that. Let me do written description. The Court controls the order of the issues. Doesn't Claim 29 claim anything at work? No, Your Honor. And therefore? No, Your Honor. And let me answer that in three parts. It has very specific requirements for mutualization and affinity. And I think the operating legal framework is the one that was articulated 17 years ago in the Lilly case and affirmed in the Ariad case. The Ariad case says explicitly you can claim things functionally. But the Lilly case says if you're going to claim things functionally, you either have to have representative species or common structural features. And that gets to, you've gotten to representative species. There are certain characteristics of these antibodies in terms of the variable region and the heavy chain type and the light chain type. And isn't it correct that the specification discloses Joe 9s and 695s with a certain variable region sequence similarity and heavy chain types and light chain types? And the accused, which is dominated by this functional claim, has quite different variable region sequence similarity, 50 versus 90 percent. And the heavy chain type is VH5 versus 3. And you've got light, kappa versus lambda. Are there any of the latter which encompass STELERA in the specification? Your Honor, let me answer that in two ways. The first is to focus on the claims and the Lilly case. The representative species have to be representative of what's in the claims. And there are affinity and neutralization requirements. This court said both in Lilly and Ariad, if you're going to have a claim that's functional, you have to have representative species. And then it went on to say one way to demonstrate you have representative species for cDNA, for instance, is by disclosing the amino acid sequence for that which you claim to be representative. And I have two parts to the answer. There are 200 disclosed species that fall within the claims. And most importantly, Your Honor, they cover... They're all of one type as opposed to the type which STELERA represents. Your Honor, I think that's the argument they made to the jury. It is, we suggest, legally incorrect for these two reasons. The first is in terms of the claim limitations, affinity and neutralization, they are the same. And in fact, if you look at the chart that we have in our brief for every single one of the claims, we demonstrated that disclosed species by amino acid sequence covered the range of what was claimed. Now, that's the first part of the answer, and we would suggest that that's enough. To adopt their argument... The jury didn't think so. And, Your Honor, that actually brings me to the first argument, but I'll come back to written descriptions. Let me finish that answer and go to the first argument because I think it's very important. The argument that they made that Your Honor just articulated would collapse the two tests. Now, we're not saying the two tests are so separate that you couldn't set aside both of them at one point in time or that some combination wouldn't be sufficient. But these claims do exactly what the first part of the Lilly test suggests. Now, let me go to the point Your Honor just made about the jury because I wanted to start with the jury instruction because it is an issue that has implications far beyond this case. This is a case in which the district court judge, over our objection, decided that I4I had overruled American hoist. It decided to give an instruction that imported the inequitable conduct standard into the burden of proof. And although it said that it was giving the instruction that the Supreme Court had bleft, it never used the words new immaterial or explained them. But didn't the jury get evidence and argument about the representativeness, what was in this fact and what wasn't? Your Honor, they got a one-sided argument. They actually got an argument where they were told at the outset this was an ex parte proceeding when it was not. They were told in opening that Senate court could not raise these issues but actually had an interference. And the third thing, Your Honor, is as this court has held, if there's an error in the jury instruction, it is presumptively prejudicial. And this is not only presumptively prejudicial but also in fact prejudicial. I don't understand your footnote 5 in your reply brief where you somehow say that even though you didn't appeal from the obviousness verdict, that the fact that you object to this jury instruction could somehow allow us to set aside that verdict too. Haven't you waived the obviousness finding, making this whole thing just an exercise? No, Your Honor. What we said is we move for a new trial. If there's a new trial because of the error in the instruction, that applies to obviousness, written description, enablement. We did not appeal from the denial of JMOL and obviousness. But the second in this case was not uncomplicated. In the 146 proceeding, the Patent Office had decided obviousness. Now, actually, Senate court had pursued obviousness, enablement, and written description. But assuming we don't buy your argument that that was a final judgment since the 146 proceeding wasn't final, so assuming that we have to put that aside, so you've got an obviousness judgment that was entered by the jury and you don't appeal from that obviousness judgment. No, we have moved for a new trial on that judgment. We didn't move for JML on that judgment, but it doesn't mean that we didn't move for a new trial on that judgment. The jury instruction infected all of the invalidity verdicts. And that's the distinction we made following this court's admonition not to just appeal everything. The JML, we thought, in fairness, we couldn't and shouldn't appeal. Don't you have to establish some kind of prejudice if there was an error in the jury instruction? Your Honor, there are two answers to that. The first is if you have an error in the burden of proof, this court has said it's presumptively prejudicial. But the second is it was prejudicial here. And if I'd asked the court just to step back and think about what happened, this jury was instructed that all of the events before the Patent Office were ex parte, but they were not. This jury heard from Senate Court both an opening... When you said the jury was instructed to that effect, or was there argument to that? No, Your Honor. Actually, over our objection, the Federal Circuit video was shown. And, Your Honor, the older version of the video, not the newer version. And, Your Honor, we'll recall that that version says it's an ex parte proceeding where the defendant doesn't have a chance to participate. We objected to that because in this particular circumstance, with the 146 proceeding, they actually had had a chance to participate. But not with respect to the issuance of the patent. Yes, Your Honor. They challenged it on written... After the fact. They challenged it during the interference. They challenged it on invalidity basis. They challenged it on written description. They challenged it for obviousness, written description enablement. They ultimately didn't pursue written description enablement. And the district court did three things. So where in your appeal does it say that you are premising your appeal on the fact that the jury saw the video? I can't give you the... We asked that, Your Honor, if you go to the portion that talks about the new trial to answer Judge Shen's prejudice argument. We pointed out the following. If I could get... I'll go through the list very quickly. We pointed out that over our objection, they were instructed it was... They were shown the video which said it was an ex parte proceeding. And it was not. Then at the opening, when Senate court opened and said you will hear evidence that the PTO did not have and could not have, we objected because there was the interference. That was the second time. Then when you got to the I4I instruction to go to the prejudice issue, Your Honor, the jury was instructed, and I'll quote it for Your Honor. The jury was instructed, you should consider that which the PTO did not have an opportunity to consider. And there are three problems with that. And that actually, this is sort of a cascade of events that lead us to where we are today. And we say it justifies a new trial on all the validity issues. Before you go there, you say all the validity issues. I thought your proposed jury instruction with respect to I4I was really just about the prior art debate. And so therefore, your challenge on the jury instructions really reduced the 103 question and doesn't really implicate the 112 grounds. Actually, Your Honor... I'm looking at 821.73 to 74. Right. And what happened, Your Honor, is we proposed it, and then there was an argument before the jury was charged. And Senate court said, no, this instruction applies not just to the prior art, but to arguments made on the 112 issues. And Your Honor will see in its inner brief what the court did is it took the instruction from the obviousness prior art section, and it moved it all the way up in the instructions and had it apply to everything. So to answer Judge O'Malley's question, at the end of the day, at the end of the day, what you had before you was a trial that began with the description of an ex parte proceeding when it was not. Arguments, as Judge O'Malley said, that the PTO could not have considered evidence when it could have. The exclusion. We were not allowed to explore what happened during the ex parte prosecution as a matter of fact. And one of the facts, Judge Lurie, to go to your question, which would have answered part of the written description issue, is this. The fact that the question of whether the amino acid sequences for representative species that satisfied the range of limitations, for example, Claim 29, was specifically considered by the Patent Office. And when we tried to elicit information... Also by the jury. Yes, Your Honor, but without knowing that the Patent Office had considered it. And this comes back to the instruction issue. The Patent Office decided on obviousness, right? Not written description. Here's what happened at the Patent Office, Your Honor. When the Patent Office proceeding was started, the Patent Office allowed Senate Court to challenge the claims on obviousness, written description, and enablement grounds. When they proceeded with their challenge, they only pursued it on obviousness grounds. Now, one question that arises from the... They didn't decide that written description was met. They did not describe it one way or another. They gave them leave to pursue it. Now, one of the questions that the collateral estoppel issues raise is the following. Is the interference proceeding and the 146 protocol... Does it tend for you to allow you to pursue a proceeding at the Patent Office under the preponderance of the evidence standard? To ask to pursue multiple claims but to pursue one on invalidity. To not prevail. Then to come back and try to take a second pass at it with the jury under a higher standard but without the jury having a clue about what happened below. And if you don't win that, to go back and say, I have a denial of oath proceeding for the district court judge under a lower burden. And as we've suggested in our brief, we don't think that's what was intended. Let me make just one last comment and save my final couple minutes for rebuttal. If we step back from all the details, the details do include what the jury was instructed. This is a case in which a jury instruction has been blessed under I4I that doesn't recognize Judge Rich and Judge Markey's American hoist opinions. Doesn't provide any basis for determining what's new in the material. Incorporates the inequitable conduct standard, not even the Theracent standard, which would have been better for us. But the older standard, which has now been discarded. And in which we were precluded from going into the details of what happened. Both at the prosecution, the ex parte prosecution and interference. And the best indication, Judge Sender, to go back to your question, there was prejudice. Because at the end of the day, district court was confused itself as to whether it had let it in or not. And in fact, it hadn't. And that confusion is the best indication that if you start the showing of the video and take it all the way to the end, this was prejudicial error. Thank you. I would like to save the remainder of your time. In fact, we'll give you three minutes because it's a complicated case. Ms. Alderkin needs three extra minutes. We'll give her that. Thank you, Your Honor. May it please the court. As the panel's questioning thus far, evidence is that the panel appreciates there are very interesting written description questions here. But that a bigger issue is that the judgment of invalidity stands because of the obviousness verdict. Unless the panel finds that the case needs to be remanded to the district court, either because collateral estoppel precluded Senate Court from asserting any invalidity defense in the infringement action. So you'd have to remand that the judge could consider the 146 action judgment. Or that you remand and direct a new trial because of error, either in the evidentiary ruling or the instruction. So I'd like to address those issues first. Why was there, where was the evidence of obviousness? You've got a functional claim here. And the trial court said it was obvious, and Jan Well was obvious to use transgenic mice to produce the antibody. That doesn't indicate that the antibody was obvious. Well, the evidence was that because you have a functional claim here, this is not a claim that recites an iota of structure. It's just a claim to an antibody that binds to IL-12, neutralizes it, and has a certain affinity in binding. What about the K-off? And the K-off, right. Is that sufficient characterization to legitimize a functional claim? Well, it's a functional, it certainly is not a structural limitation. It is purely functional. And if Your Honor is asking about what the obviousness evidence was, even though that's not the issue here, just in short, the expert, the Senate Court expert testified that with a broad functional claim like this, by the time this application was filed, there was transgenic mouse technology, there was art that showed that human antibodies could be made to human IL-12, so that if you inserted those human genes into a transgenic mouse, it was predictable that you would get an antibody that met this function. So that was some function of the obviousness evidence, very briefly. In other words, the method was obvious if you had the idea? Correct. Was the idea obvious? That was the evidence, and that was what the jury found, that this was obvious. I'd like to address a few of the things that the counsel said about the court's I-IV-I instruction. It is extremely consistent with the Supreme Court's language. Really, the only difference that the judge made in his instruction was rather than use the word materially new, which, as explained in our brief, he found confusing, because new can mean temporal, or it can mean different. He instructed the jury using the words additional information and material, and he gave them the instruction on what material meant. But the part that's really the most troubling is the fact that the trial court said that the burden somehow gets easier. Correct. Why did he even need to go there? Why not just simply say you consider all the evidence, whether it's cited or uncited, and let you all argue that because there's more art, that they should look at it? Did you propose that instruction? Yes. Actually, both parties proposed that part of the instruction, because that's consistent with what the Supreme Court said in I-IV-I. It said juries may be instructed that if materially new information is presented, materially new versus what was before the patent office, the patent owner's burden may be easier to meet, and conversely, if no materially new information is presented, it may be more difficult to meet. So that's exactly what I-IV-I said, and that the court said juries may be instructed in that regard. And instruction was proper, because there was new information presented to this jury that the patent office did not have and could not have, and that is exactly the statement that was made in the opening statements. That new information was the confidential crystal structure of Abbott's J695 antibody. It's not in the patent. It was confidential. It was produced under a protective order in this case. Evidence to the effect that it had been kept confidential by Abbott was in the record, and that was key evidence on one of the five key areas of distinction. Was it before the patent office in the I-46 proceeding? It was not. And again, in the I-46 proceeding, Senate core, as one has to do under patent office rules, identified very early in the proceeding what issues it might want to raise at final hearing, and it did say written description, enablement, obviousness. It turns out it only raised priority. It did not raise the I-12 issues. Why not? That goes into thinking of counsel that I was not involved in, but it was not raised at the patent office. The only thing the patent office considered was obviousness and the priority issue. There was no determination of I-12 issues. Back to the jury instruction, do you agree with Mr. Lee that the jury instruction debate about the correct understanding of I4I applies to all the grounds of invalidity that were considered here? Yes. So it's not just about 103, but it's also about all the I-12 grounds. Exactly, and that's one reason why this instruction is entirely appropriate, because there can be no dispute that this confidential crystal structure, which is one of the five prongs that Senate core's expert relied upon in comparing the antibodies in the patent, the J695 antibody, and by correlation, the other J09 antibodies, versus the infringing Celera, where they bind to the I-12 target. One could not know that without this confidential crystal structure, and that was key evidence because we have, from the mouths of Abbott's own witnesses, that where an antibody binds to the target can determine whether it has an effect, a desired function or not, and, of course, these are functional claims. And, moreover, we have testimony from Abbott's own witnesses that where an antibody binds to the target is determined by the structure of the antibody. So that is a key distinction. Have you ever held that a claim was not supported by adequate written description when there are over 200 species recited in the application of the patent? I'm not aware of a case that's been before this court with these facts before, but what is important is that those 200 and some examples are all very closely related to one another. I think there actually might be something like 250 examples in the patent. Two hundred of them differ from one another. Even though the key variable region of these antibodies is 200 amino acids long, 200 of those examples differ from one another by only one amino acid. They're all in the same family. They all derive from the original J09, and through trial and error, because there was no way to predict how switching in one amino acid for another would affect properties of the antibody. By trial and error, what they did was switch one amino acid at a time to improve the properties and get to J09. So I guess you're saying if they disclosed 5,000 species in their application, but if they're all based on J09 and then you have Stelara, that's still a written description flaw. It is a problem because they're relying on the representative species test. Do we have a case, or is there a case anywhere that said missing one species out of a genus is enough to be a written description defect? I'm not aware of a case like that, no, Your Honor. That can't be the law. It's not missing one. Your point is missing a whole category and being limited to a very different category. Well, exactly, and again, another key admission from APIT's expert, Dr. Marks, is that he has no idea how many antibodies are covered by these functional claims. You know, we're relying on Stelara. He has no idea how many others there might be, and he said there could be many other lineages. So we have the J09 lineage in the patent that started with J09 and led to hundreds of examples. Well, he said there could be many more of those lineages, so there could be many, many examples. Based on the evidence that was in front of the patent examiner at the time that he granted the patent, do you think it was reasonable for the examiner to have issued this patent and say that it's past written description? Because he didn't know about Stelara, and then maybe 10 years later, Stelara pops up. Isn't it a little strange that you'd have kind of like a shifting understanding of written description support for a patent? No, I think it's the inherent problem with functional claims, that one cannot know just what the scope of a functional claim is and all that it covers. And again, I keep going back to the admissions of APIT's witnesses because they're so key, but again, their expert, Dr. Marks, said you cannot, based on what's in this patent, visualize what other antibodies would be covered. But we can't, as a panel now, say that functional claiming in this area is not permissible. In this particular case, you're dealing with the fact that this particular case, that's right, and in this particular case, based on this record, a functional claim that covers something as different from anything that's disclosed in the patent as Stelara is compared to the J695 antibody, that that is simply not what the inventors invented. It's not what they described. It's not what they enabled. And under the representative species test... When I look at the other claims, and I know they're not before us, Claim 16 and some others, they seem to be based on structure. And you probably don't want to opine too much on what they cover, but they are based on structure differently from Claim 29. Exactly. Claim 16, and it has not been adjudicated. It was not litigated. But it is possibly an example of how one can have a claim of some breadth, because it does have a functional limitation, but it also has a partial structure limitation on just one of the CDR regions, which is really a very short portion of that 200 amino acid length variable region that's key for binding. So there are other ways to skin the cat, so to speak, than to claim the world, to claim things that haven't even been invented yet. Once again, K-off. Yes. We wrote in the region's case, and probably in Ariadne and others, that one should claim by structure or other distinguishing characteristics. Correct. Why isn't K-off sufficient? Because it does not distinguish... ...what antibodies are within the genus and which ones are without the genus. All this patent does and all this claim does is invite somebody skilled in the art to go out and make an invention, and guess what? If it happens to have the functional limitations that we've claimed, we claim rights to what you invented. It doesn't describe that these inventors were in possession. In other words, we claim everything that works. Exactly. It's a research plan, which this court's many cases indicate is not a sufficient written description. I don't think I got an answer. Was the patent examiner unreasonable in granting the patent? The patent examiner is presumed to have done his or her job confidently, and based on the information available. I have no reason to rebut that presumption, but the information that is ever available to a patent examiner when they're examining a functional claim like this, unless they put the burden on the patent applicant to prove what the breadth of the claim is, the patent examiner is going to have inadequate information. But we have multiple strands to this case. We have the patent office proceeding, 146. We have an infringement action, a D.J. action, and they all come together. Correct. And there was a jury verdict. Correct. And the jury, there was substantial evidence to support the jury's verdict. And since my time is limited, I would like to touch on the I4I instruction and the alleged prejudice stemming from that, if I may. You have three extra minutes, five minutes. Okay. Even if the court were to find that the instruction, which closely mirrors what the Supreme Court said, is erroneous, as was indicated in one of the questions, there has to be prejudice stemming from that for a new trial to be ordered. Counsel said, pointed to several alleged errors. One, that the jury was instructed that this was an ex parte proceeding. That was one comment in the video that was shown to the jury at the beginning of the case. Counsel actually objected to it at the time, and the judge subsequently said to the jury, and I want you to appreciate, this is a one-size-fits-all video. It doesn't apply to every case in every aspect. There was not a single mention after that of an ex parte proceeding. Where did this video come from? Who made it? I think it's the Federal Judicial Center. Mr. Lee said Federal Circuit, and I didn't remember we made a video. Federal Judicial Center. But he also said that there was an argument in an opening statement that was next. Exactly, and the argument, as I said before, was that you will hear evidence that the Patent Office did not have and could not consider, and that evidence is the evidence of the confidential crystal structure of J695, which was confidential Abbott information produced only under protective order in this litigation. The Patent Office did not have that, could not have had it. And I think I'd also like to point out, there was a suggestion that Abbott was precluded from getting into even the ex parte file history with the jury, and that is simply not the case. The entire ex parte file histories for both patents were submitted into evidence. Their expert, Dr. Marks, testified that the issues of written description, enablement, and obviousness were considered by the Patent Office before it allowed the claims. Dr. Marks testified that the Patent Office considered specific prior art references relating to phage display, one of the areas of... But they do have an argument, don't they, that Dr. Marks was constricted in what he could testify about? He was only constricted from testifying about things really that, other than the fact that there was an interference proceeding, he was restricted from testifying what wasn't in his expert report. He was invited, Abbott was invited, to present evidence to compare the prior art on which Senate Corps was relying to that which was before the Patent Office. But there was something about, he was not allowed to talk about some of the reasoning that the examiner expressed in the record. There was talk about that, but if you look at Dr. Marks' report, and when he tried to get into that, there was an objection. If you look at his report, which is actually in the record, the sum total of pages of his report dealing with the file histories is in the record at 10.741-4.6. He had absolutely no discussion of that. So there were objections, and of course keeping objections short, there wasn't always a lengthy objection, so when you read the record you had to read several pages to see what was really going on. But he was precluded from doing that. And Abbott never took up the invitation from the judge to have the jury instructed on specifically what art the Patent Office had considered. That was an invitation at 64-67 in the record. And again, they never took up the invitation to compare Senate Corps' prior art with that before the PTO, and to try to prove that it was cumulative. The judge said, feel free, go to 10. If you want to prove that this is cumulative, go there. That was invited at 74-95-96 of the record. They didn't do it. And to be honest, I think they didn't do it because they didn't have it in an expert report. They didn't have a witness to do that. And the district court judge even recognized that in his post-trial ruling. So there was no error in the I4I instruction, and there certainly was no prejudice that stemmed from anything that was instructed to the jury. If you had not appealed the interference decision, either through a 146 or a 141, would you agree that you're stopped from making the validity challenges in that District of Massachusetts jury trial? There would have been an estoppel. All the way through 103-112? Well, that's an interesting issue, Your Honor, and I don't know that there's been a case on that, to be honest, whether an estoppel stemming from an administrative decision has the same breadth as an estoppel as we sometimes see from district court action. So it hasn't been resolved or hasn't been finally decided. I don't even know, frankly, if that issue has actually been presented to the court. So I'm not willing to concede that the breadth of the estoppel would have extended past obviousness. But there would have been an estoppel if there hadn't been either an appeal to the district, to the federal circuit directly under 141 or the 146 action. But, of course, we had the latter. And simultaneously with the district court's, the jury's consideration of this, the district court was considering de novo what had happened in the Patent Office. And it was de novo because there was new evidence. Most importantly, there was live testimony who was able to observe credibility of the witnesses. So certainly no estoppel attaches to what the Patent Office did in the interference. If you have no more questions, I'll be happy to submit on that. Thank you, Ms. Elderton. Thank you. Mr. Lee will give his three minutes rebuttal time. Thank you, Your Honor. Does it seem a little weird to be on the opposite side of the written description argument? You're wondering that myself. Actually, Your Honor, I have an answer to that. Don't you have three answers to that? Sorry. Keep going. You know me very well. The answer is this. The last written description case had no examples. This one has 200. And to go to your question without three answers, I would say the following. There are 200 amino acid sequences disclosed here. I think you're correct, Judge O'Malley. If we're going to take Lilly, which has been standing for 17 years, and say the representative specie test can never apply to functional claiming, that's a pretty big change in the law. What this patent does is what Lilly blessed 17 years ago. And across the range of the claim, it has a disclosure. And that should be sufficient under the Lilly test. Does the Lilly test, though, assume a closer correlation between structure and function? Your Honor, it actually assumes that there can be. And we're not saying that there's not. But there's a reason that it states the test in the disjunctive. And there's a reason that one is structure and one is function. And, in fact, to go to Judge Chin's question, when this issue arose at the Patent Office, at A11917, and specifically, Judge Loy, your question of, are these amino acid sequences which are representative of the claim limitations sufficient, the Patent Office said, yes, it was. It cannot be that 10 years later, the disclosure of information that's not prior art, there's a reason the Patent Office didn't have it, it's not prior art, can somehow undermine that decision. Fundamentally, Senate CORE, I am on the opposite side of the issue, but I think that what we argued in the last case was consistent. And this, with 200 examples, if I had zero examples, I would be making a different argument. One thing, 200 examples with lambda light chain type and VH3 heavy chain type. And I can recite a couple more of these. And, Your Honor, the evidence actually was that the CDR3 region is the important region. And, in fact, if you look at A11917, which is what occurred at the Patent Office, the focus was on the CDR3 region. And you won't find anything in this record that says that those 250 antibodies didn't differ substantially in the CDR3 region. So there was structure. To reach the conclusions they want you to reach, as a matter of law, would basically hold that you can't satisfy the first part of the Lillie test. It sounds like the answer to the question I asked was no. I think to the latter question, the answer is no. Now, to go to the instruction... One brief thought. Yes. To finish with, your thoughts. On written... You wanted to make one more point, and while your time has expired, I'll let you make one more point. I was watching this clock, and I may have been a little bit off. On the instruction, let me just say this. Footnote 3 of our opening brief to Jomali, where we specifically raised this issue. You are correct. If there had just been an instruction that says the burden is proving by clear and convincing evidence, they have the burden, that would have been fine. They asked for an instruction that says the burden is easier to satisfy. We said if you're going to do that, you have to instruct on what American hoist says, and we proposed the language right out of American hoist that says more relevant. That's what the judge didn't give. And at the end of the day, he thought that American hoists had been overruled, when, in fact, I4I blesses Judge Rich's opinion, the first opinion. He thought the inequitable conduct standard should be the standard. This is an instruction that, in this case, was a problem, and this is an instruction that would have problems in other cases. Thank you, Mr. Lee. We'll take the case under advisement. All rise.